*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 26, 2021

Plaintiff-Appellee,

v

No. 353535
Wayne Circuit Court
LC No. 18-008894-01-FC

STEVIE GOLDEN,

Defendant-Appellant.

Before: SAWYER, P.J., and BOONSTRA and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions for second-degree murder, MCL 750.317, carrying a concealed weapon, MCL 750.227, felon in possession of a firearm (felon-in-possession), MCL 750.224f, felon in possession of ammunition, MCL 750.224f(3), and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 60 to 95 years' imprisonment for the second-degree murder conviction, 60 to 95 years' imprisonment for the carrying a concealed weapon conviction, 60 to 95 years' imprisonment for the felon-in-possession conviction, 60 to 95 years' imprisonment for the felon in possession of ammunition conviction, and two years' imprisonment for both felony-firearm convictions. We affirm.

This case arises out of a shooting on October 9, 2018, at a coney island in Detroit, Michigan. Defendant and the victim, Kevin Riggs, knew each other prior to the day of the shooting. Debra Boyd testified that, on the day of the shooting, she had seen defendant and Riggs have an altercation, during which Riggs demanded money from defendant. Eventually Riggs drove off in his truck, while defendant and Boyd walked to the store. While walking, they parted ways so that Boyd could go to the store to get change because she owed defendant $50. Defendant continued to walk to the coney island. Before reaching the coney island, defendant stopped at a house on the way to get a firearm from "associates." He claimed he was apprehensive and did not know what Riggs would do because Riggs was "super high."

-1-

When defendant arrived at the coney island, Riggs was in the parking lot. Defendant went into the coney island. He proceeded to pace the inside of the restaurant, checking the front door for Riggs. When Boyd started to approach the coney island, defendant walked outside with a gun in his hand, covered by a bandana. Riggs approached defendant and Boyd. Boyd handed defendant the money she owed him and started to walk off. Within moments, Riggs punched defendant in the face. Riggs fell to the ground, while defendant remained standing. As Riggs stood up, defendant fatally shot Riggs in the chest. Defendant walked away from the scene and was arrested at a later time.

## I. SUFFICIENCY OF THE EVIDENCE

Defendant argues that his conviction of second-degree murder must be vacated because the prosecution failed to present sufficient evidence of the requisite malice or that defendant did not act in self-defense. We disagree.

This Court reviews a challenge to the sufficiency of the evidence de novo. *People v Miller*, 326 Mich App 719, 735; 929 NW2d 821 (2019). "We review the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the prosecution proved the crime's elements beyond a reasonable doubt." *Id.* "Conflicting evidence and disputed facts are to be resolved by the trier of fact." *Id.* "[C]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Williams*, 294 Mich App 461, 471; 811 NW2d 88 (2011) (cleaned up).

"The elements of second-degree murder are (1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) the defendant did not have lawful justification or excuse for causing the death." *People v Baskerville*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 345403); slip op at 3 (cleaned up). Defendant argues that the prosecution failed to establish the third and fourth elements.

We first address whether the prosecution presented sufficient evidence for the jury to find that defendant acted with malice. "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* (cleaned up).

Defendant contends that the prosecution failed to establish that he acted with malice because the defense presented evidence that defendant did not intend to kill Riggs. Rather, defendant only intended to stop Riggs from attacking him. Defendant's argument lacks merit. Malice can be established through evidence of an intent to do great bodily harm or intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. *Id.* Defendant testified that he stopped on his way to the coney island to arm himself with a gun because he was apprehensive of Riggs's actions since Riggs could be violent, particularly when he was under the influence of substances. Once at the coney island, defendant paced the inside of the restaurant, continuously walking to the front door to peer outside at Riggs because he was "waiting on it to go down." Riggs was parked outside the building. As Boyd started to walk up to the coney island, defendant exited the coney and stood outside near the front end of Riggs's truck, while Riggs was seated inside the truck. Defendant walked to Boyd, holding the concealed handgun, which was covered with a bandana, behind his back. Within

moments, Riggs exited his truck, held his hand out, and walked up to defendant and Boyd. After Boyd handed defendant the money, defendant and Riggs started to walk toward Riggs's truck. Defendant continued to hold the gun in his hand, covered with the bandana. As they walked, Riggs punched defendant in the face. Riggs fell to the ground, while defendant remained standing. As Riggs stood up, defendant shot Riggs in the upper body from a few feet away. Riggs stumbled away from defendant and fell near the entrance of the coney island. Defendant followed behind Riggs, walked inside the coney island, and placed the gun in his back pocket. Defendant grabbed his bag of belongings that he had left inside the coney island and walked back out the front door. As defendant walked out of the door, he looked down at Riggs's body and walked off in the opposite direction.

Despite defendant's testimony that he did not intend to kill Riggs, the prosecution presented sufficient evidence for a jury to find that defendant acted with malice. Defendant armed himself with a gun, knowing there could be an altercation, he exited the coney island, knowing that Riggs was outside, he covered the gun with a bandana and held it behind his back, illustrating that he intended to hide it, and he shot Riggs in the upper body from close range. Further, defendant testified that he had the intent to stop Riggs by shooting him, he almost shot Riggs while he was on the ground, but he allowed Riggs to stand up before shooting him, and he chose not to leave the scene after being punched because he believed he had a right to stand his ground in Michigan. On the basis of defendant's actions and his own testimony, the jury could reasonably find that defendant either shot Riggs with the intent to cause great bodily harm, or with the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm.

Next, defendant argues that the prosecution failed to disprove that he acted in self-defense. Self-defense is an affirmative defense. *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010). "In general, a defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor." *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013). "With the enactment of the Self–Defense Act (SDA), MCL 780.971 *et seq.*, the Legislature codified the circumstances in which a person may use deadly force in self-defense or in defense of another person without having the duty to retreat." *Dupree*, 486 Mich at 708. MCL 780.972(1) provides, in relevant part:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:

> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

"Once a defendant raises the issue of self-defense and satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist, the prosecution must exclude the possibility of self-defense beyond a reasonable doubt." *People v Stevens*, 306 Mich App 620, 630; 858 NW2d 98 (2014) (cleaned up).

The prosecution presented sufficient evidence to exclude the possibly that defendant acted in self-defense. As stated previously, defendant deliberately armed himself with a handgun, knowing there could be an altercation. Defendant paced inside the convey island, "waiting on it to go down," but chose to exit the coney island, despite knowing that Riggs was waiting outside in his truck. Despite defendant's testimony that Riggs could see the gun in his hand, the surveillance video, as well as Boyd's testimony, indicate that the gun was not easily visible because it was inside of a bandana, which defendant held to his side or behind his back at all times before shooting Riggs. Further, contrary to defendant's testimony that Riggs's punch knocked defendant 10 feet, leaving defendant to regain his composure before shooting Riggs in fear for his life, the surveillance video illustrates that, after Riggs punched defendant, defendant remained standing, while Riggs fell forward onto the ground. Moreover, defendant's own testimony that he waited for Riggs to stand up before he shot Riggs contradicts defendant's testimony that he shot Riggs because he feared for his life. In addition, although Riggs had a bayonet on him when he was killed, the surveillance video and Boyd's testimony indicate that Riggs never reached for his knife, which was later found in the decedent's pocket. In addition, although defendant testified that he was unhealthy, could not walk well, or defend himself, the surveillance video paints a different picture. At no time during the altercation did defendant visibly struggle to walk. Further, although defendant testified that he could not escape the situation, he and Riggs were standing in an open parking lot, and defendant testified that he did not run away because he believed he had a legal right to defend himself. On the basis of the evidence as a whole, the jury could conclude that the prosecution presented sufficient evidence to disprove self-defense beyond a reasonable doubt. Although the defense presented evidence in support of self-defense, conflicting evidence and factual disputes are matters for the jury to resolve. *Miller*, 326 Mich App at 735. In sum, the prosecution presented sufficient evidence for the jury to find defendant guilty of second-degree murder.

## II. JUDICIAL IMPARTIALITY

Defendant argues that the trial court pierced the veil of judicial impartiality, denying defendant a fair trial. We disagree.

To preserve a claim of judicial impartiality, a defendant must raise the issue in the trial court. *People v Stevens*, 498 Mich 162, 180 n 6; 869 NW2d 233 (2015); *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). Defendant did not object to any of the alleged errors by the trial court that he now raises on appeal. Therefore, this issue is not preserved.

"The question whether a judge's conduct has denied a defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Swilley*, 504 Mich 350, 370; 934 NW2d 771 (2019) (cleaned up). This Court reviews unpreserved constitutional issues for plain error. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. at 763. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

"A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality." *Swilley*, 504 Mich at 370 (cleaned up). "A judge's conduct pierces this veil

and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id.* (cleaned up). "This inquiry requires a fact-specific analysis. A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality." *Stevens*, 498 Mich at 171. In *Stevens*, the Court instructed:

> In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. This list of factors is not intended to be exhaustive. Reviewing courts may consider additional factors if they are relevant to the determination of partiality in a particular case. Moreover, the aggrieved party need not establish that each factor weighs in favor of the conclusion that the judge demonstrated the appearance of partiality for the reviewing court to hold that there is a reasonable likelihood that the judge's conduct improperly influenced the jury. The reviewing court must consider the relevance and weigh the significance of each factor under the totality of the circumstances of the case. [*Id.* at 172 (cleaned up).]

Further, "[i]n reviewing claims of judicial partiality, a reviewing court must first examine the nature or type of judicial conduct itself." *Swilley*, 504 Mich at 371 (cleaned up). "Improper judicial conduct may come in many forms, including belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions." *Id.* at 371-372 (cleaned up).

Defendant first argues that the trial court improperly informed the jury that defendant had been charged as a fourth-offense habitual offender. "In reviewing instructional-error claims, this Court examines the instructions as a whole, and even if there are some imperfections, there is no basis for reversal if the instructions adequately protected the defendant's rights by fairly presenting to the jury the issues to be tried." *People v Rosa*, 322 Mich App 726, 738 n 6; 913 NW2d 392 (2018) (cleaned up).

After the jury was empaneled, the court read to the jury the initial jury instructions. After reading the elements of each of the charges, the court stated:

> The defendant is charged with Habitual Offender Fourth Offense Notice. The defendant was previously convicted of three or more felonies or attempts to commit felonies, and at least one of these crimes was a prior listed felony as defined in MCL 769.126a.

The court, undoubtably recognizing it should not have read the habitual-offender notice to the jury, stated nothing else regarding defendant's status as a fourth-offense habitual offender or prior convictions.

It was clearly erroneous for the trial court to inform the jury that defendant had been charged as a fourth-offense habitual offender. A defendant's status as a habitual offender is merely a sentence enhancement and not a substantive crime. *People v Zinn*, 217 Mich App 340, 345; 551 NW2d 704 (1996) ("Michigan's habitual offender statutes are merely sentence enhancement mechanisms rather than substantive crimes."). Thus, there was no reason for the jury to be informed of defendant's status as a fourth-offense habitual offender. Moreover, it appears from the record that the trial court's statement was a mistake. The court had not read the notice to intentionally inform the jury of defendant's status as a habitual offender. It appears that the court realized the mistake in reading the habitual-offender notice because the court stopped prior to describing the qualifying felonies.

Nonetheless, because the court's statement was clearly erroneous, defendant must establish that the error affected the outcome of the proceedings. *Carines*, 460 Mich at 763. Defendant has failed to establish that, but for the court's error, the outcome of the proceedings would have been different. Defendant contends that the trial court's statement was particularly harmful because it damaged defendant's credibility, which was a central issue in this case. Although defendant's credibility was at issue, this was not a case based solely on the testimony of witnesses. Rather, the surveillance video captured the incident, and the jury was able to see defendant's actions. Defendant admittedly armed himself with a gun, headed to the coney island, paced back and forth inside of it, exited the coney island with the concealed gun in his hand, engaged Riggs, and shot Riggs at close range when Riggs stood up after falling to the ground. Further, defendant made numerous statements during his own testimony to cast doubt on whether he feared for his safety when he shot Riggs. Defendant contended that he was "waiting on it to go down," he waited for Riggs to stand up before shooting, and he believed he had a right to shoot defendant under self-defense laws. Although the court's statement indicated to the jury that defendant had a criminal history, the evidence, particularly the surveillance video of the whole altercation, provided ample proof of defendant's guilt such that the court's statement did not affect the outcome of the proceedings.

Further, the court did not inform the jury of what felonies or attempted felonies defendant had been convicted. In addition, the court instructed the jury that it should not consider the court's instructions or the crimes with which defendant was charged as evidence. The court also instructed the jury that it "must decide this case based only on the evidence admitted during the trial." "[J]urors are presumed to have followed their instructions." *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011). On the basis of the jury instructions as a whole, the jurors were instructed of the charges and the evidence on which they were allowed to rely. Therefore, on the basis of the record as a whole, defendant was not deprived of a fair trial.

Defendant also argues that the trial court improperly interrupted defendant numerous times while testifying, which communicated to the jury that the trial court either did not believe defendant or was bothered by his answers. Under MRE 611(a), the court has a duty to exercise control of the proceedings:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless

consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

The excerpts from the jury trial illustrate the court's attempt to control defendant's testimony to help the jury ascertain the truth and to avoid the needless consumption of time. The following are instances of the court interjecting that defendant references on appeal in support of his argument:

[*Defense Counsel*]: And how often would you, did you see Kevin Riggs high?

[*Defendant*]: Man, well I can tell you this. At one point and time [Riggs's] son had died and he got a wrongful death lawsuit for about—

[*Defense Counsel*]: I'm going to stop you there.

[*Prosecutor*]: Objection, Your Honor. That doesn't have anything to do with—

*The Court*: Strike that from the record.

[*Defendant*]: Okay, I'll say this—

*The Court*: Wait, wait. Slow down, sir.

[*Defendant*]: Um-hum.

[*The Court*]: Slow down. Counsel, go ahead with your question.

\* \* \*

[*Defense Counsel*]: The question to you is how often did you see him get high?

[*Defendant*]: All of the time.

[*Defense Counsel*]: Okay. And did you have altercations with Kevin Riggs?

[*Defendant*]: Yes, I did.

[*Defense Counsel*]: And how many altercations did you have with Kevin Riggs?

[*Defendant*]: We would, we would, we would serious, get into some serious arguments you know here and there because—

*The Court*. Sir, he asked you how many did you have?

-7-

* * *

[*Defense Counsel*]: Excuse me. Were you expecting [Riggs] to come inside of the coney island when you walked in?

[*Defendant*]: Man, let me tell you, I don't—[Riggs] is unpredictable. You don't know if he going—

*The Court*: Sir, did you expect him to come in there, yes or no?

* * *

[*Defense Counsel*]: Okay. And when he walks up on you, how are you feeling when he's walking up on you?

[*Defendant*]: I'm—He [sic] trying to get close to me. I—

*The Court*: No, no, sir.

[*Defense Counsel*]: How did you feel—

*The Court*: How did it make you feel?

The court also interjected twice to prevent defendant from continuing to testify after he had answered the question:

[*Defense Counsel*]: Okay. And after a result of that incident [sic], did you fear Kevin Riggs?

[*Defendant*]: I had always feared Kevin Riggs because when Kevin Riggs—

*The Court*: Alright, you have answered the question.

* * *

[*Defense Counsel*]: Okay. And you indicated at that point you got this firearm why?

[*Defendant*]: Because I was very apprehensive.

[*Defense Counsel*]: Okay, apprehensive of what?

[*Defendant*]. And, and, and— About being caught you know with nothing. The, the rest was in the air, man. You know I didn't know if you know because he got friends and stuff that get high and they do they little things to make they [sic] money to get they [sic] drug money and, and, and a lot of time they going in people pockets, you know what I'm saying. So I was very apprehensive about who was going to come where you know because if I'm walking down the street and you got

somebody driving by us or people walking by and they know I got certain stuff, I don't know—

    *The Court*:  Okay.  He has answered the question.  Next question?

*   *   *

    [*Defense Counsel*]:  Okay.  And at a certain point do you see where Kevin Riggs goes?

    [*Defendant*]:  Yeah.

    [*Defense Counsel*]:  Where does he go?

    [*Defendant*]:  Into his truck.  I watched everything he did—

    *The Court*:  Okay, you have answered the question.  Next question.

Defendant also references the two following examples to illustrate that the trial court also improperly interjected during defendant's cross-examination.

    [*The prosecutor*]:  Let me, let me stop you there.  Are you able to physically at this point if you—Are you physically able to box with him or fight with him?

    [*Defendant*]:  Man, let me tell you something.  I, I don't—

    [*The prosecutor*]:  Actually—

    *The Court*:  Sir, the question is—

    [*The prosecutor*]:  —it's yes or no answer.

    *The Court*:  —can you physically box with him, yes or no?

    [*Defendant*]:  No, I can't.

*   *   *

    [*The prosecutor*]:  And do you see at any point him go towards or reach for this Bayonet he had?

    [*Defendant*]:  I seen the Bayonet when he fell.  When he fell the Bayonet was sticking out of his shirt.  You could see it.  It's—I mean it's kind of hard to hide fifteen inches worth of metal.

    [*The prosecutor*]:  Now at a certain point did you think—

    *The Court*.  No, but the question is, the question was—

[*Defendant*]: Yeah, I seen—

*The Court*: —did you see him ever go—

[*Defendant*]: Yes, sir.

*The Court*: —for the Bayonet?

[*Defendant*]: Yes, sir.

Upon review of the record, the court did not improperly interject during defendant's testimony. As illustrated from the excerpts, on multiple occasions, the court was attempting to control defendant's testimony because defendant was not answering the questions specifically asked or providing miscellaneous information. Accordingly, the record illustrates that to ensure there was a clear record for the jury to determine defendant's innocence or culpability as to the crimes charged, the court restricted the defendant to answering *only* the questions asked of him. In addition, on multiple instances, the court interjected most likely to avoid the needless consumption of time because defendant had already answered the question. The court had a duty to ensure that the trial proceeded fairly and efficiently. The court did not improperly interject itself in the proceedings. There is no indication that the court acted in an impartial manner.

Defendant also argues that the trial court improperly read the self-defense instruction, M Crim JI 7.23(1), during the final jury instructions. M Crim JI 7.23 addresses past violent acts of the complainant or decedent and provides:

[Specific Acts]

(1) There has been evidence that the [complainant/decedent] may have committed violent acts in the past and that the defendant knew about these acts. You may consider this evidence when you decide whether the defendant honestly and reasonably feared for [his/her] safety.

[General Reputation]

(2) There has been evidence that the [complainant/decedent] may have had a reputation for cruelty or violence. You may consider this evidence when you decide whether it was likely that the [complainant/decedent] threatened to hurt the defendant physically, and whether the defendant honestly and reasonably feared for [his/her] safety.

When the trial court read the jury the final jury instructions, the court stated:

There has been evidence that the defendant (sic) may have committed violent acts in the past and that the defendant knew about these acts. You may consider this evidence when you decide whether the defendant honestly and reasonably feared for his safety.

-10-

There has been evidence that the decedent may have had a reputation for cruelty or violence. You may consider this evidence when you decide whether it was likely the decedent threatened to hurt the defendant physically and whether the defendant honestly and reasonably feared for his safety.

In the first sentence, the court clearly erred by stating that "defendant" may have committed violent acts in place of the "complainant" or "decedent." However, because defendant failed to object to this instruction, this Court reviews this issue for plain error.

Defendant has failed to establish that the court's error affected the outcome of the proceedings. Reviewing the jury instruction as a whole, the instruction conveyed to the jury that it could consider Riggs's prior violent acts. The first line of the instruction would make little sense if defendant was to know of his own violent past. Moreover, there was no evidence that defendant had committed violent acts in the past. Therefore, the instruction would serve little purpose under the mistaken reading. Further, the second portion of the instruction highlights that the purpose of the instruction was to inform the jury that it could focus on Riggs's violent reputation and whether defendant feared for his safety on the basis of this reputation. Moreover, the jury was given a written copy of the jury instructions, which properly stated the instruction, and there is no indication that the jury was confused about the instruction or whose acts it could consider. Therefore, the trial court's error did not affect the outcome of the proceedings.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that defense counsel provided ineffective assistance of counsel by failing to request a voluntary manslaughter jury instruction. We disagree.

Defendant preserved his claim of ineffective assistance of counsel by filing in this Court a motion to remand for a *Ginther*[1] hearing. *People v Abcumby-Blair*, ___ Mich App ___, ___: ___ NW2d ___ (2020) (Docket No. 347369); slip op at 8. "Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Solloway*, 316 Mich App 174, 187; 891 NW2d 255 (2016). "Generally, a trial court's findings of fact, if any, are reviewed for clear error, and questions of law are reviewed de novo." *Id*. at 188. However, because defendant did not move for a new trial or a *Ginther* hearing in the lower court, and because this Court denied his motion to remand,[2] no factual record was created in regard to defendant's claim of ineffective assistance of counsel. Therefore, our review is limited to mistakes apparent on the record. *Id*.

In order to prevail on a claim of ineffective assistance of counsel, a defendant has the burden of establishing that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] *People v Golden*, unpublished order of the Court of Appeals, entered December 17, 2020 (Docket No. 353535).

136 (2012). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012) (cleaned up). "Defendant must overcome the strong presumption that counsel's performance was sound trial strategy." *People v Dixon*, 263 Mich App 393, 396; 688 NW2d 308 (2004).

Declining to request a jury instruction can be a matter of trial strategy. *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013). An "all-or-nothing" defense in which defense counsel declines to request instructions on a lesser offense and instead seeks an outright acquittal is a legitimate trial strategy. *People v Allen*, 331 Mich App 587, 610; 953 NW2d 460 (2020), vacated in part on other grounds by 953 NW2d 197 (2020). Further, requesting an instruction on a lesser offense could have undermined defendant's theory that he acted in self-defense and "may [have] reduce[d his] chances of acquittal." *Id*. "A failed strategy does not constitute deficient performance." *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008).

It was sound trial strategy not to request a voluntary manslaughter jury instruction. The defense strategy was clearly to establish that defendant was acting in self-defense. Thus, by acting in self-defense, defendant could have been acquitted of second-degree murder. By requesting an instruction on a lesser offense, the jury could have found defendant not guilty of second-degree murder but settled on the lesser offense of voluntary manslaughter. Therefore, defense counsel's strategy may have been the "all or nothing" approach, which was reasonable.

Moreover, the facts do not support a voluntary manslaughter instruction. "To prove that a defendant committed voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *People v Mitchell*, 301 Mich App 282, 286; 835 NW2d 615 (2013) (cleaned up). "[T]he degree of provocation required to mitigate a killing from murder to manslaughter is that which causes the defendant to act out of passion rather than reason." *Id*. at 286-287 (cleaned up). "[I]n order for the provocation to be adequate it must be that which would cause a reasonable person to lose control." *Id*. at 287 (cleaned up). Although Riggs punched defendant, there was no evidence that defendant responded by shooting Riggs in the heat of passion. Rather, defendant clearly testified that he shot Riggs out of fear for his life. Thus, defendant sought to establish that his actions were calculated and reasonable to protect himself, not the actions of a person who had lost control. Therefore, there was insufficient evidence to support a voluntary manslaughter instruction. Accordingly, defense counsel did not provide ineffective assistance of counsel for failing to request a jury instruction on the lesser charge of voluntary manslaughter.

In defendant's Standard 4 Brief, defendant argues that trial counsel provided ineffective assistance of counsel by failing to investigate Derek Booker as a defense witness. We disagree.

Defendant did not preserve this argument by filing a motion for a new trial or a *Ginther* hearing in the lower court, *People v Lopez*, 305 Mich App 686, 693; 854 NW2d 205 (2014), or by filing a motion to remand in this Court on this ground, *Abcumby-Blair*, ___ Mich App at ___; slip op at 8. Therefore, this argument is reviewed for errors apparent on the record. *Id*. While defense counsel's failure to undertake a reasonable investigation may constitute ineffective assistance of counsel, *Trakhtenberg*, 493 Mich at 51-52, "decisions regarding what evidence to present and

-12-

whether to call or question witnesses are presumed to be matters of trial strategy, which [this Court] will not second-guess with the benefit of hindsight," *Dixon*, 263 Mich App at 398 (cleaned up).

Defendant contends that defense counsel provided ineffective assistance of counsel by failing to investigate Booker. First, it was likely trial strategy not to call Booker as a witness. It was clear Booker witnessed the shooting. He can be seen on the surveillance video. Boyd testified that he accompanied her to the coney island, and he was on the prosecution's witness list. Therefore, defense counsel was likely aware of Booker as a potential witness but chose not to pursue him as a defense witness. Further, defendant has failed to establish that he was prejudiced by trial counsel's decision not to call Booker as a witness. Even if Booker made a statement that Riggs assaulted defendant, as defendant contends he did, it is unclear how Booker's testimony would have assisted the defense. There was surveillance video of the whole altercation. There is no dispute that Riggs approached defendant in the parking lot, demanded money from defendant, and then punched defendant in the face. Booker's testimony was not necessary to establish that Riggs punched defendant. Defendant does not assert that Booker had any knowledge about the relationship between defendant and Riggs that would have assisted the defense in establishing self-defense. Therefore, defendant has also failed to show that he was prejudiced by defense counsel's decision not to investigate or call Booker as a witness.

In defendant's Standard 4 Brief, he also argues that defense counsel provided ineffective assistance of counsel by failing to investigate whether Riggs tried to rob defendant. Defendant failed to properly preserve this argument. Therefore, it is reviewed for errors apparent on the record. *Abcumby-Blair*, ___ Mich App at ___; slip op at 8.

Is it unclear from defendant's argument how additional evidence regarding Riggs's intent to rob defendant would have assisted the defense. Defendant testified that Riggs demanded money from him and had the intention of robbing him. Boyd testified that she overheard Riggs demand money from defendant. Evidence was introduced that Riggs had a bayonet on him when he demanded money and punched defendant in the face. This evidence was clearly presented. However, the jury still found that defendant did not act in self-defense. There is no indication that additional evidence that Riggs tried to rob defendant would not have affected the outcome of the proceedings. Therefore, defendant has also failed to establish that defense counsel provided ineffective assistance of counsel on this ground.

## IV. SENTENCING ERRORS

Defendant argues that he is entitled to resentencing because he was sentenced in part on the basis of his refusal to admit guilt. We disagree.

Generally, "[s]entencing issues are reviewed by this Court for an abuse of discretion by the trial court." *People v Sabin (On Second Remand)*, 242 Mich App 656, 660; 620 NW2d 19 (2000). "A trial court abuses its discretion when it imposes a sentence that is not proportional to the seriousness of the circumstances surrounding the offense and the offender." *Id*. at 661. This Court reviews a constitutional due process claim de novo. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007).

"A court cannot base its sentence even in part on a defendant's refusal to admit guilt." *People v Conley*, 270 Mich App 301, 314; 715 NW2d 377 (2006) (cleaned up). "However, evidence of a lack of remorse can be considered in determining an individual's potential for rehabilitation." *People v Dobek*, 274 Mich App 58, 104; 732 NW2d 546 (2007). This Court looks to three factors to establish whether the sentencing court incorrectly considered a defendant's refusal to admit guilt: "(1) the defendant's maintenance of innocence after conviction; (2) the judge's attempt to get the defendant to admit guilt; and (3) the appearance that had the defendant affirmatively admitted guilt, his sentence would not have been so severe." *People v Payne*, 285 Mich App 181, 194; 774 NW2d 714 (2009) (cleaned up).

During the sentencing hearing, defendant addressed the court. Defendant stated that he deeply apologized to Riggs's family. After apologizing to Riggs's family, defendant continued, stating that it was an absolute "travesty against justice" that Riggs's family was led to believe that he died over $5 when in fact, Riggs had set defendant up and was trying to rob him. Defendant expressed that Riggs was a "crackhead" and a monster, who died with six drugs in his system. Defendant stated that Riggs was "high and he was coming down off that high and he thought he was going to keep getting high by attacking me and taking my stuff." Defendant further stated that he had brought the gun with him to the scene to protect himself, and then he asked hypothetically, "when do I protect myself? At what stage and point do I have to accept abuse in order to finally say I don't want no more?" In response, the court stated:

> Alright. Well [defendant], first of all, I had an opportunity to watch the tape of what occurred with regard to this incident and well first of all, I would like to put down that your statement there you show absolutely no remorse for your act. And I think the jury got this verdict exactly right, and I didn't see any self-defense in this case whatsoever.
>
> What I saw is you tracked this man down and shoot him and kill him for no reason whatsoever, [defendant]. What I, also, see reviewing your Presentence Report is a man that has thirteen felony convictions, has been in and out of jail and prison repeatedly throughout his life, has twelve misdemeanors. Shows absolutely zero remorse. And took a gun for no reason whatsoever and shot and killed [Riggs]. Shot him in the chest and shot him down for no reason. There was no reason this had to happen. And what you did is you took away three children's father, you took away an uncle, brother. You took away his, the mother's children from him (sic). You took away a grandfather and you've, you've ruined this family, and I think you've ruined your family, too. And it's just, it's just the selfishness that I see in your life the entire [sic] when I read your life story it says to me that [defendant] cares about one person and one person only, and that's [defendant]. And this, this book is full of that.

Looking to the first factor, "the defendant's maintenance of innocence after conviction," at the sentencing hearing, defendant maintained his innocence, expressing that Riggs had tried to rob defendant, and defendant had a gun to protect himself. Looking to the second factor, "the judge's attempt to get the defendant to admit guilt," at no time did the court try to get defendant to admit guilt. The court's reference to defendant's lack of remorse did not appear to be a comment on defendant's refusal to admit guilt. Rather, it appeared to be more of a response to defendant's

selfish statements, which were focused almost completely on how he had been wronged. Looking to the third factor, "the appearance that had the defendant affirmatively admitted guilt, his sentence would not have been so severe," there is no indication that the court would have sentenced defendant to a less severe sentence if defendant had admitted guilt. To the extent the court considered defendant's lack of remorse, it was much more akin to a finding that defendant lacked a potential for rehabilitation given his selfish behavior and extensive criminal record. Further, the court implied that the specific facts of this case led to the court's sentence. Defendant's statements at the sentencing hearing had no bearing on the facts of the case. Therefore, the court did not sentence defendant based upon defendant's refusal to admit guilt.

Defendant also argues that the trial court sentenced defendant on the basis of inaccurate information and acquitted conduct. We disagree.

"A defendant is entitled to be sentenced by a trial court on the basis of accurate information." *People v Francisco*, 474 Mich 82, 88; 711 NW2d 44 (2006). Further, "trial courts cannot make factual findings at sentencing based on acquitted conduct." *People v Beesley*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 348921); slip op at 7 (cleaned up).

During the sentencing hearing, the trial court stated, "[w]hat I saw is you tracked this man down and shoot him and kill him for no reason whatsoever." Defendant contends that the trial court's statement reflects its finding that defendant plotted to kill Riggs, despite no such evidence being admitted at trial. Accordingly, defendant argues that the court's sentence was based upon inaccurate information.

The court's statement did not reflect its reliance on inaccurate information to sentence defendant. Prior to making that statement, the court stated that it watched the surveillance video. The court's comment regarding defendant tracking Riggs down was likely based upon defendant's own testimony and his actions as seen on the video. Defendant went to the coney island with a gun because he was apprehensive of Riggs, he paced inside the coney island, he continuously looked out the front door, he walked outside, despite knowing that Riggs was outside, and he kept a bandana over his gun until he shot Riggs. The use of the word "tracking" does not imply that the court made findings that were not part of the record.

Further, defendant contends that the court's statement illustrated that the court sentenced defendant on the basis of acquitted conduct. The court's comment did not imply that the court sentenced defendant on the basis of acquitted conduct, i.e., premeditated murder. The jury convicted defendant of second-degree murder. Thus, the jury found that defendant had the requisite malice and was not acting in self-defense. As stated earlier, "[m]alice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Baskerville*, ___ Mich App at ___; slip op at 3. The court's comments were consistent with these findings. The court's statement that defendant "tracked" Riggs down did not imply that defendant committed premeditated murder or that the court sentenced defendant on such a belief. The court could have based its statement upon a finding that defendant intended to see Riggs at the coney island, and that once the confrontation between defendant and Riggs began, defendant intended to kill Riggs, intended to cause great bodily harm, or intended to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause

death or great bodily harm. Therefore, the court's statement was consistent with the jury's finding of second-degree murder and did not insinuate that defendant committed premediated murder.

Defendant also argues that his 60-year minimum sentence for second-degree murder is unreasonable and disproportionate because it is a de facto life sentence. We disagree.

"If a minimum sentence is within the appropriate guidelines sentence range, the court of appeals shall affirm that sentence and shall not remand for resentencing absent an error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence." MCL 769.34(10). "In [*People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015)], the Supreme Court held that Michigan's sentencing guidelines violated the Sixth Amendment right to a jury trial, and it remedied the constitutional infringement by declaring the guidelines advisory only." *People v Posey*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 351834); slip op at 8. "*Lockridge* did not alter or diminish MCL 769.34(10)." *Id*. at ___; slip op at 8 (cleaned up). Therefore, "when a trial court does not depart from the recommended minimum sentencing range, the minimum sentence must be affirmed unless there was an error in scoring or the trial court relied on inaccurate information." *Id*. at ___; slip op at 8 (cleaned up).

Defendant's minimum sentencing guidelines range is 26¼ years to 87½ years' (315 to 1,050 months') imprisonment. Therefore, defendant's minimum sentence of 60 years' imprisonment for second-degree murder is within the minimum sentencing guidelines range. Defendant does not argue that there was an error in scoring, and defendant's argument that the trial court relied on inaccurate information lacks merit. Because defendant's minimum sentence for second-degree murder is within the minimum sentencing guidelines range, this Court must affirm his sentence.

Affirmed.

/s/ David H. Sawyer
/s/ Mark T. Boonstra
/s/ Michelle M. Rick